IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

THE WHITING-TURNER
CONTRACTING COMPANY,

    *Plaintiff*,

    v.

    Civil Action No. ELH-12-401

LIBERTY MUTUAL INSURANCE CO.,

    *Defendant*.

**MEMORANDUM OPINION**

The Whiting-Turner Contracting Company ("Whiting-Turner"), plaintiff, sued its purported insurer, Liberty Mutual Insurance Co. ("Liberty Mutual"), defendant, based on Liberty Mutual's belated decision to deny coverage to Whiting-Turner with respect to a lawsuit filed against Whiting-Turner in a Nevada state court (the "Nevada Suit").[1] Liberty Mutual defended Whiting-Turner in the Nevada Suit until, over five years into the litigation, on the Friday before a scheduled Monday settlement conference, Liberty Mutual asserted that it was not obligated to cover Whiting-Turner for most of the claims in the suit. Whiting-Turner asserts that, as a result of Liberty-Mutual's "last-minute" change of position, Whiting-Turner was obliged to contribute substantial amounts of its own money to settle the Nevada Suit and avoid exposure to greater liability at trial.

---

[1] This case originated in the Circuit Court for Baltimore County, Maryland, and was removed to this Court by Liberty Mutual on the basis of diversity jurisdiction. *See* 28 U.S.C. §§ 1332(a); 1441; *see also* Notice of Removal (ECF 1). Diversity jurisdiction is satisfied here. *See* 28 U.S.C. § 1332(a), (c)(1). Whiting-Turner is a Maryland corporation with its principal place of business in Maryland; Liberty Mutual is a Massachusetts corporation with its principal place of business in Massachusetts; and plaintiff seeks damages in excess of $850,000, surpassing the $75,000 amount-in-controversy threshold.

Whiting-Turner levels five counts against Liberty Mutual.  Count I seeks a declaratory judgment stating that Liberty Mutual is obligated under the applicable insurance agreements to reimburse Whiting-Turner for the full amount of Whiting-Turner's settlement payment in the Nevada Suit, plus interest, attorneys' fees, and costs.  Count II asserts a claim for breach of contract on the same basis.  In Count III, plaintiff asserts a cause of action for breach of an insurer's duty of good faith under Md. Code (2006 Repl. Vol., 2012 Supp.), § 3-1701 of the Courts & Judicial Proceedings Article ("C.J.") and its companion provision, Md. Code (2011 Repl. Vol., 2012 Supp.), § 27-1001 of the Insurance Article ("Ins.").  Count IV alleges a non-statutory cause of action for "bad faith," and Count V presents a claim of promissory estoppel.[2]

Liberty Mutual has filed a "Motion to Dismiss, or for a Stay of the Proceedings Pending Arbitration" (the "Motion") (ECF 16).  According to Liberty Mutual, it is not a proper party to this case because it is not a party to the insurance agreements at issue.  Rather, Liberty Mutual claims that plaintiff's insurers under the applicable agreements are two different (albeit related) companies: Liberty Mutual Fire Insurance Company ("Liberty Fire") and Liberty Insurance Company ("Liberty Insurance").  In the alternative, Liberty Mutual contends that a contractual provision of one of the insurance agreements obligates the parties to resolve their dispute in arbitration.  And, if the Court were to reach the merits of the suit, Liberty Mutual maintains that each of the counts is fatally defective.

The Motion has been fully briefed,[3] and no hearing is necessary to resolve it.  *See* Local

---

[2] The bad faith count and promissory estoppel claims are both styled as "Count IV." However, the promissory estoppel claim is actually the fifth count.  Therefore, I will refer to it as "Count V."

[3] I have considered defendant's motion and its supporting memorandum (ECF 16-1) (collectively, "Motion"); plaintiff's Opposition (ECF 18); and defendant's Reply (ECF 21).

Rule 105.6.  For the reasons that follow, it will be granted in part and denied in part.

**Factual Background**[4]

Whiting-Turner is a construction company with a national business.  *See* Complaint ¶ 6.  In 1998, it procured a Commercial General Liability insurance policy, designated as Policy No. RG2-631-004070-048 (the "CGL Policy" or the "Policy").  *Id.* ¶ 8.[5]  The CGL Policy is composed of a declarations page, a "Commercial General Liability Coverage Form" ("CGL Form"), and numerous endorsements.

In general, the CGL Policy provides that the insurer "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies," and will have "the right and duty to defend the insured against any 'suit' seeking those damages."  CGL Policy at A0000057.  The detailed provisions of the CGL Policy are not relevant to resolution of the Motion, however.

Although Whiting-Turner alleges in its complaint that it "purchased" the CGL Policy "from Liberty Mutual," Complaint ¶ 8, the Policy itself supports Liberty Mutual's claim that Liberty Fire is the actual insurer under the Policy.  The top of both the declarations page and the CGL Form contains a "LIBERTY MUTUAL" logo (the text "LIBERTY MUTUAL" accompanied by an image of the Statue of Liberty).  But, below the logo on the declarations page is the text "Liberty Mutual Fire Insurance Company - Boston,"  CGL Policy at A000001, and below the logo on the CGL Form is the text "Fire Insurance Company, Boston, Massachusetts," such that, when combined with the text of the logo, the CGL Form states: "Liberty Mutual Fire

---

[4] Unless otherwise noted, the facts set forth in this section are drawn from the complaint.

[5] Although Whiting-Turner did not submit a copy of the CGL Policy with its complaint, Liberty Mutual appended a copy of the CGL Policy as Exhibit A to the Motion (ECF 16-2), and Whiting-Turner agrees that it is an authentic copy.  *See* Opposition at 4.

Insurance Company, Boston, Massachusetts." *Id.* at A0000057.  Moreover, at the end of each of the endorsements in the Policy, the following text appears: "This endorsement is executed by the company below designated by an entry in the box opposite its name." *E.g. id.* at A0000017. Under that phrase are five checkboxes next to the names "Liberty Mutual Insurance Company," "Liberty Mutual Fire Insurance Company," "Liberty Insurance Corporation," "LM Insurance Corporation," and "The First Liberty Insurance Corporation." *Id.*  On each endorsement, an "X" appears only in the box next to "Liberty Mutual Fire Insurance Company," *i.e.*, Liberty Fire. *Id.*

In any event, during the period of coverage under the CGL Policy, Whiting-Turner entered into a contract to act as the general contractor for the construction of an office building in Las Vegas, Nevada.  Complaint ¶¶ 13-14.  Construction was completed in September 1999. *Id.* ¶ 15.  In September 2005, the owner of the building filed the Nevada Suit against Whiting-Turner, as well as several of Whiting-Turner's subcontractors and the building's architect, alleging that the building "suffered extensive property damage as a result of alleged negligence, defects and deficiencies in the planning, development, design, construction and administration" of the construction project. *Id.* ¶ 16.

Whiting-Turner asserts that it "immediately placed Liberty Mutual on notice" of the Nevada Suit, and that, "[w]ithout issuing any reservation of rights, Liberty Mutual undertook Whiting-Turner's defense and assigned a Nevada law firm of Liberty Mutual's choosing to serve as Whiting-Turner's defense counsel" in the Nevada Suit. *Id.* ¶¶ 17-18.  According to plaintiff, throughout the litigation Liberty Mutual "exercised control over the direction of Whiting-Turner's defense," "communicated directly with Whiting-Turner's counsel, often to the

exclusion of Whiting-Turner," and paid all invoiced defense costs directly to Whiting-Turner's defense counsel.  *Id.* ¶¶ 20-21.

Plaintiff maintains that, from the inception of the Nevada Suit in 2005 until 2007, Liberty Mutual gave no indication whatsoever that there was any dispute as to coverage.  *Id.* ¶ 22.  Then, in February 2007, Karen Borrego, the Senior Technical Claims Specialist for Liberty Mutual who was assigned to the claim arising from the Nevada Suit, sent to Whiting-Turner a reservation of rights letter.  She stated that, "'upon review of [Liberty Mutual's] file, [she] realized that a [c]overage position letter had not been sent.'"  *Id.* ¶ 23 (quoting letter; some alterations added).  Although the February 2007 letter took note of several exclusions in the CGL Policy, the letter affirmatively stated: "'[O]ur policy *would* apply to damage to Whiting-Turner's own non-defective work, *and to damage to or arising out of work performed by subcontractors.*'"  *Id.* ¶ 26 (quoting letter; emphasis in complaint).  According to Whiting-Turner, the damage alleged in the Nevada Suit "consisted entirely of damage to or arising out of work performed by Whiting-Turner's subcontractors."  *Id.* ¶ 27.  Therefore, Whiting-Turner continued to believe there was no dispute as to coverage.  *Id.*[6]

Whiting-Turner maintains that in mid-2009, while the Nevada Suit was still ongoing, it began to negotiate a "liability buyout" with Liberty Mutual, such that "Liberty Mutual would assume all present and future obligations arising under certain insurance policies, including the Policy."  *Id.* ¶ 28.  Whiting-Turner asserts that Liberty Mutual prepared a "Claim Report" identifying all open claims under the policies that Liberty Mutual proposed to assume under the

---

[6] Liberty Mutual has submitted a copy of Ms. Borrego's letter of February 2007 as Exhibit D to the Motion (ECF 16-5).  Whiting-Turner does not appear to dispute the authenticity of Exhibit D, and its contents are generally consistent with the description in the complaint.

buyout.  *Id.* ¶ 30.  The coverage claim associated with the Nevada Suit was included in the Claim Report.  *Id.* ¶ 29.  According to Whiting-Turner, Liberty Mutual agreed, under the buyout, to assume full liability for all claims arising under the subject policies, in exchange for Whiting-Turner's payment of a buyout cost.  *Id.* ¶ 33.  Whiting-Turner paid the sum of $1,431,885 as a buyout cost to Liberty Mutual, and "understood that Liberty Mutual was thereafter assuming liability for the claims on the Claim Report."  *Id.* ¶ 36.

In its complaint, Whiting-Turner alleges that "the buyout was consummated by a Loss Portfolio Transfer Policy prepared by Liberty Mutual, with an effective date of October 1, 2009." *Id.* ¶ 35.  However, Whiting-Turner did not include a copy of the alleged Loss Portfolio Transfer Policy with its complaint.  As Exhibit B to the Motion (ECF 17), Liberty Mutual has submitted a document entitled "Loss Portfolio Transfer Insurance Policy," with Policy No. EK7-M31-004070-359, which it contends is the "Loss Portfolio Transfer Policy" to which Whiting-Turner refers.  Exhibit B is authenticated by a "Policy Certification Form," dated February 28, 2012, *see* ECF 17 at 2, by which Patricia Faunce, a Manager for Commercial Markets with "UW Support Operations [–] CMSO Consolidate Operations" in Lewiston, Maine, certified that Exhibit B is "a true copy of the original policy issued."[7]

Whiting-Turner does not agree that this document is the authentic "Loss Portfolio Transfer Policy."  Indeed, Whiting-Turner maintains that it never received or reviewed the document submitted as Exhibit B by Liberty Mutual until October 2011, when Whiting-Turner contacted Liberty Mutual through its then-current insurance broker, in anticipation of this

---

[7] Ms. Faunce's foundation to testify with respect to the contents of the records of Liberty Mutual and/or Liberty Insurance is not immediately apparent from the certification form.

litigation, to request documents related to the loss portfolio transfer.  *See* Opposition at 6-7.[8]
Whiting-Turner has submitted an affidavit of one of its Vice-Presidents, Edward Spaulding, to
corroborate these assertions.  *See* Affidavit of Edward Spaulding ("Spaulding Aff."), Ex.A to
Opposition (ECF 18-1).  It has also submitted, as Exhibit 1 to Mr. Spaulding's affidavit (ECF 18-
1 at 5-8), a document on Liberty Mutual letterhead, entitled "Term Sheet [–] Whiting Turner
Contracting Company [–] Loss Portfolio Transfer," which Whiting-Turner contends "reflects the
terms of the Loss Portfolio Transfer."  Opposition at 5.  For ease of reference, and consistent
with the usage of the parties, I will refer to the document submitted by Liberty Mutual as the
"LPT Policy" and refer to the document submitted by Whiting-Turner as the "LPT Agreement."

Of import here, the LPT Policy contains an arbitration provision that states, in part, that,
"[a]s a condition precedent to any right of action hereunder, any dispute or difference arising
between the parties out of this Agreement shall be submitted to the decision of a board of
arbitration composed of two arbitrators and an umpire," and that the "majority decision of the
board shall be final and binding upon all of the parties to the proceeding."  LPT Policy § 4.K, at
B000006.  In contrast, the LPT Agreement does not mention arbitration.

In addition, the LPT Policy contains a group of five checkboxes in the upper left corner
of its first page, next to the same list of five companies as in the CGL Policy.  An "X" is placed
only in the box next to "Liberty Insurance Corporation," *i.e.*, Liberty Insurance.  However,
unlike the CGL Policy, there is no language in the LPT Policy that expressly states the intended

---

[8] Whiting-Turner also maintains that even the version of the document it received in
October 2011 differs materially from the version submitted as Liberty Mutual's Exhibit B.  *See*
Opposition at 7.

meaning or effect of the checkboxes.  Moreover, the top of the policy pages of the LPT Policy only contains the name and logo of "Liberty Mutual," without further elaboration.

The last page of the LPT Agreement contains the signature of Richard Rey, a Regional Underwriting Manager.  Above the signature, it says: "Accepted for: Liberty Mutual Insurance Company."  LPT Agreement at 7.  The LPT Agreement was also signed for Whiting-Turner by Stephen P. Duffy, Whiting-Turner's Executive Vice-President.  *Id.*

Unlike the LPT Agreement, the LPT Policy does not contain the signature of a representative of Whiting-Turner.  In addition, although the LPT Policy is signed by the President and Secretary of the insurer, it also includes a signature line for the countersignature of an "Authorized Representative," and states: "[T]he Company [*i.e.*, the insurer] has caused this policy to be signed by its President and secretary in Boston, Massachusetts, but this policy shall not be binding on the Company unless countersigned by another officer or attorney-in-fact of the Company."  LPT Policy at B000007.  The countersignature line does not contain a signature.  *Id.*

Whiting-Turner claims that it understood that Liberty Mutual had assumed liability for the Nevada Suit pursuant to the loss portfolio transfer, and so Whiting-Turner did not actively participate in the Nevada Suit after October 2009, aside from cooperating with Liberty Mutual upon request.  Complaint ¶ 42-45.  In September 2010, five years after the commencement of the Nevada Suit, "with very little notice and no regard for the schedule of the numerous parties involved, Liberty Mutual demanded that Whiting-Turner's defense counsel cancel a mediation session scheduled for September 13, 2010 to allow Liberty Mutual to 'further assess the plaintiff's damages claims.'"  *Id.* ¶ 47.  However, for the next several months Liberty Mutual did not further communicate any position with regard to coverage.  *Id.* ¶¶ 50.

The mediation was rescheduled by the Nevada court for Monday, April 4, 2011. On Friday, April 1, 2011, Ms. Borrego, Liberty Mutual's claims representative, emailed Whiting-Turner's defense counsel and demanded that the mediation be rescheduled "'for 2-3 weeks or in early May,'" in order to permit Liberty Mutual to make a "'fully informed decision'" with respect to coverage. *Id.* ¶¶ 52-55 (quoting email). Whiting-Turner's defense counsel obtained the postponement; however, Whiting-Turner was sanctioned approximately $5,000 as a result of the last-minute request for postponement. *Id.* ¶¶ 56-57. The Nevada court rescheduled the mediation for Monday, May 23, 2011. *Id.* ¶ 58.

By mid-May, Whiting-Turner had not heard further from Liberty Mutual. *Id.* ¶ 60. Accordingly, on May 11, 2011, Whiting-Turner's corporate counsel wrote to Liberty Mutual, "expressing concern that Liberty Mutual had not effectively defended Whiting-Turner's interests in the [Nevada Suit], and stating that failure by Liberty Mutual to seriously engage in the upcoming May 23, 2011, mediation would leave Whiting-Turner at significant risk." *Id.* ¶ 61.

Whiting-Turner alleges that it did not receive a response from Liberty Mutual until the evening of Friday, May 20, 2011, when counsel for Liberty Mutual wrote to Whiting-Turner, denying coverage as to "'most of the claims'" in the Nevada Suit. Whiting-Turner claims that the letter of May 20, 2011, did not specifically delineate the non-covered claims. *Id.* ¶¶ 64-67 (quoting letter). Liberty Mutual has submitted, as Exhibit E to its Motion (ECF 16-6), what it contends is the May 2011 letter, although it is dated May 16, 2011; the letter was sent to Jennie Holland, a Claims Manager with Whiting-Turner, from Lucas M. Gjovig, Esq., of the law firm Duane Morris, LLP, who asserted that his firm "represent[ed] Liberty Mutual Insurance Company." Ex.E at 1. Whiting-Turner does not appear to dispute the authenticity of Mr.

Gjovig's letter.  *See* Opposition at 4 (quoting Liberty Mutual's Exhibit E).  Mr. Gjovig stated, in part:

> Liberty Mutual has been providing for Whiting-Turner's defense in this action and intends to appear at the mediation and participate in good faith. . . . Liberty Mutual requests that a representative of Whiting-Turner personally attend and participate in the mediation as an authorized representative of Whiting-Turner. As stated below and in Liberty Mutual's Reservation of Rights letter dated February 2, 2007, which is incorporated herein by this reference, most of the claims made against Whiting-Turner are not covered under the Liberty Mutual policy . . . .   Plaintiff primarily is seeking remediation of "your work" and preventative measures, neither of which are covered.  Moreover, only "loss of use" (i.e. tenant impact costs) arising from resultant damage, not from "your work," would be covered.

The following Monday, May 23, 2011, both Whiting-Turner and Liberty Mutual appeared at the mediation.  *Id.* ¶ 74.  Liberty Mutual refused to tender the policy limits in settlement of the lawsuit.  *Id.*  On or about July 8, 2011, a final settlement agreement was executed by all parties and insurers involved in the Nevada Suit.  *Id.* ¶ 75.  Whiting-Turner paid $850,000 toward the settlement, and Liberty Mutual paid $350,000.  *Id.* ¶ 76.  In the settlement agreement, Whiting-Turner "expressly reserved all claims, losses, causes of action, costs, expenses, attorneys' fees, liabilities, indemnities, duties and obligations of any nature connected with the [Nevada Suit], that Whiting-Turner has against Liberty Mutual."  *Id.* ¶ 77.

Additional facts are included in the Discussion.

## Discussion

### A.  Standards of Review

Liberty Mutual has moved to dismiss for failure to state a claim or, in the alternative, to dismiss or stay the case pending arbitration, pursuant to the arbitration provision of the LPT Policy.  Motions to dismiss for failure to state a claim are authorized by Fed. R. Civ. P. 12(b)(6).

Although no Federal Rule of Civil Procedure expressly addresses motions to dismiss or stay pending arbitration, the Fourth Circuit has observed that an arbitration clause is "'a specialized kind of forum-selection clause,'" and has said that "'a motion to dismiss based on a forum-selection clause should be properly treated under Rule 12(b)(3) as a motion to dismiss on the basis of improper venue.'" *Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355, 355 n.9 (4th Cir. 2012) (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974), and *Sucampo Pharm., Inc. v. Astellas Pharma, Inc.*, 471 F.3d 544, 550 (4th Cir. 2006)). Moreover, 9 U.S.C. § 3, a provision of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.*, provides that a court, "upon being satisfied that [an] issue involved in [a pending] suit or proceeding is referable to arbitration under [a written arbitration] agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement."[9]

In considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court "'must accept as true all of the factual allegations contained in the complaint,'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). Whether a complaint states a claim for relief is judged by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). It provides that a complaint must contain a "short and plain statement of the

---

[9] Ordinarily, the "'proper course of action when a party seeks to invoke an arbitration clause is to stay the proceedings pending arbitration,'" under Section 3 of the FAA, "'rather than to dismiss outright.'" *Aggarao*, 675 F.3d at 376 n.18 (citation omitted). However, Fourth Circuit case law indicates that dismissal, rather than a stay, may be "a proper remedy when *all* of the issues presented in a lawsuit are arbitrable." *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709-10 (4th Cir. 2001) (emphasis added); *see also Aggarao*, 675 F.3d at 376 n.18 (discussing *Choice Hotels* and status of circuit split as to "whether a district court has discretion to dismiss rather than stay an action subject to arbitration").

claim showing that the pleader is entitled to relief." The plaintiff need not include "detailed factual allegations in order to satisfy" Rule 8(a)(2). *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). But, a complaint that provides no more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action," is insufficient. *Id.* To satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . .[the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Id.* at 556. If the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has not shown that "'the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (citation omitted).

Typically, a motion pursuant to Rule 12(b)(6) "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (internal quotation marks omitted). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint," the court may resolve the applicability of a defense by way of a Rule 12(b)(6) motion. *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). "This principle only applies, however, if all facts necessary to the affirmative defense '*clearly appear*[ ] *on the face of the complaint*,'" or in other documents that are proper subjects of consideration under Rule 12(b)(6). *Id.* (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)) (emphasis in *Goodman*).

In general, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450

(4th Cir. 2007). But, there are some limited exceptions. For instance, the court may properly consider documents "attached or incorporated into the complaint." *Philips v. Pitt County Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). And, the court may also consider documents submitted with the motion to dismiss that are "'integral to and explicitly relied on in the complaint,'" so long as "there [is] no authenticity challenge" to those documents. *E.I. du Pont*, 637 F.3d at 448 (quoting *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)); *see also Philips*, 572 F.3d at 180 (4th Cir. 2009).[10]

In contrast, a motion to dismiss for improper venue, filed under Rule 12(b)(3), "allows the court to freely consider evidence outside the pleadings, unlike under a 12(b)(6) motion." *Sucampo*, *supra*, 471 F.3d at 550; *accord Aggarao*, *supra*, 675 F.3d at 365-66. However, unless an evidentiary hearing is held with respect to the motion, the plaintiff is obliged "to make only a prima facie showing of proper venue in order to survive a motion to dismiss." *Aggarao*, 675 F.3d at 366. In assessing a Rule 12(b)(3) motion on the basis of the papers, the court must "view the facts in the light most favorable to the plaintiff." *Id.*; *see Estate of Myhra v. Royal Carribean Cruises, Ltd.*, 695 F.3d 1233, 1239 (11th Cir. 2012) ("When the parties submit conflicting affidavits, the court, *in the absence of an evidentiary hearing*" on a Rule 12(b)(3) motion, must "'give greater weight to the plaintiff's version of the jurisdictional facts and to construe such facts in the light most favorable to the plaintiff.'") (emphasis added) (citation omitted); *Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1139-40 (9th Cir. 2004) ("Upon holding an evidentiary

---

[10] A court has discretion under Rule 12(b)(6) to consider additional matters outside of the pleadings, pursuant to Rule 12(d). But, if the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). Here, no party has asked the Court to convert the Motion to one for summary judgment, and I decline to do so.

hearing to resolve material disputed facts, the district court may weigh evidence, assess credibility, and make findings of fact that are dispositive on the Rule 12(b)(3) motion."); *accord Continental Cas. Co. v. Am. Nat'l Ins. Co.*, 417 F.3d 727, 733 (7th Cir. 2005); *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005).[11]

In addition, the FAA reserves for trial the question of whether an arbitration agreement has been made, provided that a question of fact as to that issue is properly generated.  *See* 9 U.S.C. § 4.[12]  "If the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof."  *Id.*  In order to generate an issue for resolution by a fact finder, however, the party opposing arbitration must make "'an unequivocal denial that the agreement [to arbitrate] had been made,'" and must produce "'some evidence . . . to substantiate the denial.'"  *Drews Distributing, Inc. v. Silicon Gaming, Inc.*, 245 F.3d 347, 352 n.3 (4th Cir. 2001) (citations and some internal quotation marks omitted).  "State contract law governs the question of whether the parties have agreed to arbitrate . . . ."  *In re Cotton Yarn Antitrust Litig.*, 505 F.3d 274, 278 (4th Cir. 2007) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).[13]

---

[11] Neither party requested an evidentiary hearing on the Motion.  And, as I will explain, I do not find one to be warranted on the basis of the parties' submissions.

[12] In non-admiralty cases, a party may demand trial by jury of the issue of the existence *vel non* of an arbitration agreement.  *See* 9 U.S.C. § 4.  In this case, Whiting-Turner has generally demanded "a trial by jury on all issues so triable." Complaint at 19.

[13] Both parties have relied upon Maryland case law in their briefing but have not expressly addressed the issue of choice of law.  Accordingly, I will assume, without deciding, that, as to issues of state law in this case, Maryland law applies.

<u>B.  Dismissal as Improper Party Defendant</u>

Liberty Mutual's lead argument is that it is not liable to Whiting-Turner because it was not Whiting-Turner's insurer.  Rather, Liberty Mutual maintains that Liberty Fire was Whiting-Turner's insurer under the CGL Policy, and Liberty Insurance was Whiting-Turner's insurer under the LPT Policy.

As noted, with respect to the CGL Policy, Whiting-Turner concedes the authenticity of the copy of the Policy submitted by Liberty Mutual.  Accordingly, the CGL Policy is a proper subject of consideration under Rule 12(b)(6).  *See E.I. du Pont*, *supra*, 637 F.3d at 448.  Under the plain text of the CGL Policy, Liberty Fire was Whiting-Turner's insurer.  In its Opposition, Whiting-Turner states that it "will file an Amended Complaint adding [Liberty Fire] and such other Liberty Mutual entities, as determined by the Court, as parties to this action."  Opposition at 4 n.3.  However, Whiting-Turner has not filed an amended complaint at this juncture, and "does not concede that as currently alleged Liberty Mutual has no liability as contended."  *Id.* at 10 n.7.  According to Whiting-Turner, Liberty Mutual represented in the LPT Agreement that "it had control and authority over *all* of the various policies Whiting-Turner purchased, *including* the CGL Policy."  *Id.* at 10-11 (emphasis in original).  Moreover, Whiting-Turner notes that it alleged in its complaint that Liberty Mutual "sent correspondence to Whiting-Turner evidencing its assumption of responsibility for with regard to the defense of the [Nevada Suit]."  *Id.* at 11.  Therefore, as Whiting-Turner sees it, "Liberty Mutual's own actions, as detailed extensively in the Complaint, demonstrate that it took responsibility for the rights and obligations of the named insurer in the CGL Policy and the LPT Agreement."  *Id.*

In my view, because it is clear that Liberty Fire was Whiting-Turner's insurer under the CGL Policy, Whiting-Turner's claims against Liberty Mutual for breach of that Policy (as distinct from claims that Liberty Mutual breached obligations arising from the loss portfolio transfer with respect to the CGL Policy) are deficient, as currently pled. Liberty Mutual was not a party to the CGL Policy and so it cannot be liable for breach of the Policy, unless it subsequently adopted or assumed Liberty Fire's obligations under the Policy. *See, e.g.*, *Snider Bros., Inc. v. Heft*, 271 Md. 409, 414, 317 A.2d 848, 851 (1974) ("Normally a person cannot be held liable under a contract to which he was not a party. However, a person not originally a party to a contract may later accept or adopt it, and he will then be bound by it.") (internal citation omitted). To be sure, the complaint is replete with allegations that "Liberty Mutual" procured counsel for Whiting-Turner and directed Whiting-Turner's defense in the Nevada Suit. But, there is no express allegation that Liberty Mutual assumed or adopted the obligations of the insurer under the CGL Policy after it was issued, aside from the matter of the loss portfolio transfer, which I will address, *infra*. Rather, the complaint alleges that Liberty Mutual was the insurer under the CGL Policy from the outset. Yet, that claim is clearly contradicted by the CGL Policy itself.

As I see it, in the absence of express factual allegations that Liberty Mutual assumed or adopted Liberty Fire's obligations under the CGL Policy, the complaint does not contain "enough factual matter (taken as true) to suggest" Liberty Mutual's liability for breach of the CGL Policy, *Twombly*, *supra*, 550 U.S. at 555, and does "not permit the court to infer more than the mere possibility of misconduct" by Liberty Mutual. *Iqbal*, *supra*, 556 U.S. at 679. Accordingly, I will dismiss, without prejudice, plaintiff's claims against Liberty Mutual, to the

extent that they are based on liability under the CGL Policy.  However, I will grant leave to file

an amended complaint, in which plaintiff may add Liberty Fire (or other entities) as defendants[14]

and/or may augment its allegations against Liberty Mutual with specific factual averments that

Liberty Mutual assumed or adopted the obligations of the insurer under the CGL Policy.[15]

Liability with respect to the loss portfolio transfer is a different matter.  Because Whiting-

Turner disputes the authenticity of the LPT Policy submitted by Liberty Mutual, the LPT Policy

is not a proper subject of consideration under Rule 12(b)(6).  *See E.I. du Pont*, 637 F.3d at 448.

To be sure, the LPT Agreement submitted by Whiting-Turner with its Opposition is also not

appropriate for Rule 12(b)(6) review.  "'[I]t is axiomatic that the complaint may not be amended

by the briefs in opposition to a motion to dismiss.'"  *Mylan Laboratories, Inc. v. Akzo, N.V.*, 770

F. Supp. 1053, 1068 (D. Md. 1991) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d

1101 (7th Cir. 1984)); *see also Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997)

(stating that a plaintiff "is bound by the allegations contained in its complaint and cannot,

through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998).

Nevertheless, the complaint, considered alone, clearly and sufficiently alleges that Liberty

Mutual entered into a loss portfolio transfer with Whiting-Turner.  Liberty Mutual's claim that it

---

[14] Whiting-Turner requests "leave from the Court to conduct discovery prior to amending given the conflicting statements in the documents produced thus far."  Opposition at 11.  In my view, based on the current state of the record, Whiting-Turner has sufficient facts available to it to amend its complaint to add Liberty Fire and/or Liberty Insurance as defendants, without further discovery.  Therefore, I perceive no basis to delay amendment of the complaint.  If subsequent discovery reveals a basis for naming further additional defendants, Whiting-Turner may file a motion for leave to do so at that time.  Of course, I intimate no view as to how the Court will rule on such a motion.

[15] To be sure, some evidence currently in the record, including Mr. Gjovig's letter, suggests that Liberty Mutual may have assumed Liberty Fire's obligations under the CGL Policy.  However, I reiterate that, as currently pleaded, the complaint does not expressly allege that Liberty Mutual assumed the obligations of another insurer.

was not the entity that contracted with Whiting-Turner for the loss portfolio transfer presents a factual dispute that cannot be resolved in the context of a motion to dismiss under Rule 12(b)(6).

## C.  Arbitration

In contrast to the standard under Rule 12(b)(6), the Court is empowered to consider matters extrinsic to the complaint in the context of Liberty Mutual's request to dismiss or stay the case pending arbitration, pursuant to Rule 12(b)(3) and Section 3 of the FAA.  Accordingly, the Court may consider the LPT Policy, which contains an express mandatory arbitration provision.  However, I am also entitled to consider the LPT Agreement, which does not mention arbitration, and Mr. Spaulding's affidavit, in which he avers that Whiting-Turner was never presented with the LPT Policy until it began to prepare for this lawsuit in October 2011, and "never agreed to the terms reflected in the LPT Policy" with respect to arbitration.  Spaulding Aff. ¶ 9.  Moreover, unless an evidentiary hearing is conducted, I must resolve factual inferences and disputes of fact in favor of Whiting-Turner, as the plaintiff.

The Supreme Court has repeatedly emphasized "the first principle that underscores all of [the Court's] arbitration decisions: Arbitration is strictly 'a matter of consent,' and thus 'is a way to resolve those disputes—*but only those disputes*—that the parties have agreed to submit to arbitration.'"  *Granite Rock Co. v. Int'l Bhd. of Teamsters*, ___ U.S. ___, 130 S. Ct. 2847, 2857 (2010) (quoting *Volt Information Sciences, Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 479 (1989), and *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)) (emphasis in *Granite Rock*).  Thus, a court may "order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement nor (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or

applicability to the dispute is in issue." *Granite Rock*, 130 S. Ct. at 2857-58. Put another way, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002); *accord Waterford Inv. Servs., Inc. v. Bosco*, 682 F.3d 348, 353 (4th Cir. 2012).

This case presents a clear-cut dispute about whether Whiting-Turner is bound by the arbitration provision contained in the LPT Policy. Whiting-Turner has presented affidavit testimony that it did not agree to arbitrate disputes arising out of the loss portfolio transfer. Liberty Mutual has presented no affidavit evidence concerning the creation of the LPT Policy document. If Liberty Mutual had presented evidence to contradict Whiting-Turner's assertions, this matter might be appropriate for an evidentiary hearing (or "summar[y] . . . trial," in the words of the FAA) to resolve factual disputes as to that issue. Instead, Liberty Mutual maintains that, even if Whiting-Turner was never actually presented with the LPT Policy, the Court must hold, as a matter of law, that Whiting-Turner is bound by its provisions. Liberty Mutual's position contravenes the guiding legal principal of mutual consent to arbitration that underpins the FAA.

Liberty Mutual posits that the LPT Agreement was "effectively an insurance binder that incorporated the terms of the actual policy of insurance that was subsequently issued." Reply at 6. "'An insurance binder is a contract of temporary insurance to be effective insurance coverage until a formal policy is drafted and issued.' It is not a complete contract, but it is evidence of a contractual obligation to be expressed in final written form at a later date." *Anton v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 634 F.3d 364, 370 n.4 (6th Cir. 2011) (internal citation omitted); *see also Flester v. Ohio Cas. Ins. Co.*, 269 Md. 544, 551, 307 A.2d 663, 666-67 (1973). Liberty

Mutual argues: "Federal courts have held consistently that a reference to an insurance policy form contained in a binder, or temporary contract of insurance, is sufficient to bind the insured and the insurer to the terms and conditions contained in the policy ultimately issued." Reply at 7.

Moreover, Liberty Mutual argues that, as the Fourth Circuit has recognized, there are "five theories 'aris[ing] out of common law principles of contract and agency law' [that] could provide a basis 'for binding nonsignatories to arbitration agreements: 1) incorporation by references; 2) assumption; 3) agency; 4) veil piercing/alter ego; and 5) estoppel.'" *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 417 (4th Cir. 2000) (citation omitted). According to Liberty Mutual, the first and the last of these theories apply here: the LPT Agreement incorporates the LPT Policy by reference, and Whiting-Turner is estopped from rejecting the arbitration provision if it seeks the benefits of the LPT Policy.

Liberty Mutual relies primarily on two cases for the proposition that a party, by executing an insurance binder, may bind itself to an arbitration provision contained in a later-issued policy of insurance. *See Progressive Casualty Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela*, 991 F.2d 42 (2d Cir. 1993); *Stony Brook Marine Transp. Corp. v. Wilton*, No. 94-CV-5880, 1996 U.S. Dist. LEXIS 22222 (E.D.N.Y. May 1, 1996) (report and recommendation of magistrate judge), *adopted by* 1996 U.S. Dist. LEXIS 22221 (E.D.N.Y. July 3, 1996). However, both of the cases cited by Liberty Mutual are readily distinguishable from this case in its current posture.

In *Stony Brook*, it was undisputed that the insured's agent in the negotiation of the "order slip," or binder for insurance at issue in that case, "had dealt with [the insurer's underwriter] before;" that he "was familiar with the terms and conditions of the [underwriter's] standard

arbitration clause;" that he "prepared the order slip referencing the [underwriter's] arbitration clause;" and that he "had undertaken the responsibility for conveying accurately and completely the terms and conditions of the Underwriters' policy to the plaintiff." *Stony Brook*, 1996 U.S. Dist. LEXIS 22222, at *6.  Here, Liberty Mutual has submitted no evidence as to similar knowledge on the part of Whiting-Turner or its agents in the negotiation of the loss portfolio transfer.

In *Progressive Casualty*, a Venezuelan insurer purchased reinsurance of a portion of its risk portfolio with an American reinsurer.  *Progressive Casualty*, 991 F.2d at 44.  The reinsurance policy contained a provision that stated: "'Subject to Facultative Reinsurance Agreement.'"  *Id.* at 45 (quoting agreement).  In turn, the Facultative Reinsurance Agreement, or "FRA," to which the policy referred, provided for arbitration of "'[a]ny question or dispute arising between the contracting parties concerning the interpretation of this Reinsurance Agreement.'"  *Id.* (quoting FRA).  The Second Circuit held that the American reinsurer was subject to the arbitration agreement contained in the FRA, reasoning: "The Policy specifically and unequivocally identifies the FRA by name.  The use of capitalized letters in the phrase 'Subject to *F*aculative *R*einsurance *A*greement' indicates to any reasonable person that a specific document is being referenced."  *Id.* at 47 (emphasis in original).  It reasoned: "If [the American reinsurer] was unfamiliar with the FRA, it should either have asked [one of the brokers who negotiated the policy], or objected to the provision before signing the Policy.  Having failed to do so, [the American reinsurer], as a very sophisticated party, is deemed as a matter of law to have understood and agreed to all aspects of the Policy."  *Id.*

To be sure, the LPT Agreement contains the following text: "Policy Form: Loss Portfolio Transfer Policy."  LPT Agreement at 1.  But, unlike the text in *Progressive Casualty*, this text does not expressly make the agreement "Subject to" the provisions of another document, so as to alert the reader of the LPT Agreement that there is another document containing material terms of the agreement.  The undisputed state of the record at this juncture is that the LPT Policy was never provided to Whiting-Turner.  Indeed, the version of the LPT Policy submitted by Liberty Mutual is unexecuted and, according to Whiting-Turner, was never actually issued.  As Liberty Mutual strenuously argues in connection with its claim that it is not a proper party defendant in this case, the LPT Policy appears to originate with a different insurer (Liberty Insurance), with which Whiting-Turner claims it never contracted.  The development of a factual record through discovery may illuminate these issues but, on the current state of the record, there is no basis for the Court to conclude that Whiting-Turner is bound by the arbitration provision contained in the LPT Policy.[16]

### D.  Merits Contentions

Liberty Mutual also maintains that each of Whiting-Turner's claims is defective on the merits.  As to the declaratory judgment claim, defendant reiterates its arguments that it is not a proper party and that the dispute is subject to arbitration, which I have already resolved.  The only additional argument it advances is that "what is being sought in this case is actually an award of money damages" and, "[b]ecause a declaratory judgment would not effectuate such an award, declaratory relief is neither appropriate or necessary."  Motion at 13.

---

[16] In light of my conclusion, I need not address at this point the other arguments against the arbitration provision advanced by Whiting-Turner, which include its claim that there was no consideration for the arbitration provision and no mutuality of obligation.

To be sure, courts have "substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995).  But, a district court should rule on a request for declaratory relief "when declaratory relief 'will serve a useful purpose in clarifying and settling the legal relations in issue,' and 'will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'"  *Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 594 (4th Cir. 2004) (citation omitted).  Liberty Mutual cites no case for the proposition that a declaratory judgment is automatically inappropriate in the context of a money damages claim, and I am aware of none.

Under Maryland law, when a complaint seeking a declaratory judgment presents a justiciable controversy,  "a motion to dismiss 'is rarely appropriate.'"  *120 West Fayette St., LLLP v. Mayor of Baltimore*, 413 Md. 309, 355, 992 A.2d 459, 487 (2010) (citation and some internal quotation marks omitted).  " It is proper to dismiss a declaratory judgment action only where there is a lack of jurisdiction or where a declaratory judgment is not an available or appropriate type of remedy," *Christ by Christ v. Md. Dept. of Nat. Res.*, 335 Md. 427, 435, 644 A.2d 34, 37 (1994), such as where the dispute is moot, unripe, the parties lack standing, or there is another applicable statutory remedy.  *See 120 West Fayette St.*, 413 Md. at 356–57, 992 A.2d at 488.  In this case, the Court may ultimately conclude, for a variety of reasons, that declaratory relief is not warranted.  But, as I see it, there is no basis to reach that conclusion at the pleading stage.

As to the breach of contract claim, Liberty Mutual asserts that Whiting-Turner does not mention a "specific policy provision" that it claims was breached, and so Liberty Mutual "is left to wonder what exactly is at issue."  Motion at 14.  But, the policies at issue are liability

insurance policies that, in general, obligate the insurer broadly to defend and indemnify the insured, in the absence of applicable exclusions from coverage.  Under the facts alleged by Whiting-Turner, Liberty Mutual was obliged to defend and indemnify it in the Nevada Suit, in accordance with the insurance policies at issue, and, in fact, did so until its alleged eleventh-hour notification to Whiting-Turner that "most of the claims" in the lawsuit were not covered by the policies.  Whiting-Turner claims that this notice, *i.e.*, Mr. Gjovig's letter, failed to identify sufficiently the non-covered claims or the policy exclusions that negated coverage.  To the extent that the basis of Liberty Mutual's denial of coverage is adequately set forth in Mr. Gjovig's letter, Liberty Mutual should be well aware of the contractual terms at issue, because they were discussed and relied upon by its own counsel.  Moreover, viewing the facts alleged in the light most favorable to Whiting-Turner, as I must, Liberty Mutual's dilatory approach to investigation and denial of coverage arguably violated the insurer's duty of good faith and fair dealing that is implied in every contract, regardless of the specific policy provisions at issue.  *See, e.g.*, *Blondell v. Littlepage*, 413 Md. 96, 112-14, 991 A.2d 80, 90-91 (2010) (discussing the "duty of good faith and fair dealing, implied in all contracts").  Thus, Whiting-Turner's complaint is not defective for failing to allege the specific policy provisions at issue.

I turn to Count III, which alleges failure to act in good faith in denying insurance coverage, under C.J. § 3-1701 and its companion, Ins. § 27-1001.  This statutory cause of action was created relatively recently, in 2007.  *See* 2007 Md. Laws, ch. 150.  Taken together, the two statutes require an insurer to make "an informed judgment based on honesty and diligence supported by evidence the insurer knew or should have known at the time the insurer made a decision on a claim."  C.J. § 3-1701(a)(4); Ins. § 27-1001(a).  The statutes authorize a cause of

action against an insurer that fails to act in good faith in denying coverage, and authorize the insured to recover "actual damages," up to the limits of the applicable insurance policy, along with attorneys' fees,[17] expenses, other litigation costs, and interest.  C.J. § 3-1701(e).[18]

Of import here, the statutory cause of action for failure to act in good faith "applies only to first-party claims under property and casualty insurance policies issued, sold, or delivered in the State [of Maryland]."  C.J. § 3-1701(b).  Liberty Mutual contends that the statutory cause of action does not apply here because, in its view, this case involves a third-party claim, not a first-party claim.  According to Liberty Mutual, because "the gravamen of this count is the alleged mishandling of the defense and settlement of the claim asserted by [the plaintiff in the Nevada Suit] against Whiting-Turner, it is clear that what is at issue is a third party, and not a first party claim."  Motion at 16.

In my view, Liberty Mutual misconstrues the statute.   Under Liberty Mutual's interpretation, the statutory cause of action would not apply to a liability insurer's denial of coverage.  To be sure, liability insurance is often referred to as insurance against "third-party claims," to distinguish it from coverage for damage to the insured's own person or property, *i.e.*, the person or property of the "first party" to the policy.  *See, e.g.*, *Cole v. State Farm Mut. Ins. Co.*, 359 Md. 298, 308, 753 A.2d 533, 538-39 (2000) ("The policy that was the subject of the suit between Harris & Brooks, Inc. and its insurer required the insurer to pay all sums which Harris

---

[17] The attorneys' fees recoverable may not exceed one third of actual damages.  C.J. § 3-1701(g).

[18] A claim under C.J. § 3-1701 is ordinarily subject to an administrative exhaustion requirement with the Maryland Insurance Administration.  *See* C.J. § 3-1701(c)(1); *see also* Ins. § 27-1001(c)-(g).  However, there is an exception to the exhaustion requirement for claims on "commercial insurance polic[ies] with respect to which the applicable limit of liability exceeds $1,000,000," C.J. § 3-1701(c)(2)(iii), which would apply here, assuming the statute applies at all.

& Brooks, Inc. became legally obligated to pay as damages 'caused by accident.'  Hence, the implicit coverage insured against third party claims.")  (internal citation omitted).

However, as indicated, the statutory cause of action for denial of coverage without good faith applies "to *first-party claims* under property *and casualty insurance policies* issued, sold, or delivered in the State [of Maryland]."  C.J. § 3-1701(b) (emphasis added).  "Casualty insurance" is defined in Section 1-101 of the Insurance Article.  *See* C.J. § 3-1701(a)(2) ("'Casualty insurance' has the meaning stated in § 1-101 of the Insurance Article.").  It includes, *inter alia*, "insurance against legal, contractual, or assumed liability for death, injury, or disability of a human being, or for damage to property."  Ins. § 1-101(i)(1)(i).  If the limitation to "first-party claims" were intended to exclude claims by an insured against its insurer for coverage against liability on a claim brought by a third party against the insured, the inclusion of claims for coverage under "casualty insurance" would be meaningless.  Such liability claims are precisely the type that "casualty insurance" ordinarily covers.  In my view, the limitation to "first-party" claims simply means that only an insured, rather than a claimant against the insured, may bring a claim under C.J. § 3-1701 against an insurer that denies coverage.

The statutory good faith cause of action is relatively new, and there are not yet any reported judicial decisions interpreting the meaning of the limitation to "first-party claims" under the statute.  However, the statute establishes an administrative claims process with the Maryland Insurance Administration ("MIA") for claims under the statutes, and the MIA's decisions are in harmony with the foregoing interpretation of the statutory text.  Under Maryland law, an "'agency's interpretation and application of the statute which [it] administers should ordinarily be given considerable weight by reviewing courts.'"  *Dept. of Human Resources, Balt. City Dept.*

*of Social Servs. v. Hayward*, 426 Md. 638, 650, 45 A.3d 224, 231 (2012); *see also Md. Aviation Admin. v. Noland*, 386 Md. 556, 571-73 & nn.2-3, 873 A.2d 1145, 1154-55 & nn.2-3 (2005). Similarly, under federal law, the Supreme Court has "long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations" in formal rulemaking or adjudication. *Chevron, U.S.A., Inc. v. Nat. Res. Defense Council, Inc.*, 467 U.S. 837, 844 (1984) (footnote omitted).

The MIA publishes on its website selected decisions under Ins. § 27-1001. *See* http://www.mdinsurance.state.md.us/. In at least two decisions, the MIA has held that it lacked jurisdiction over a claim under Ins. § 27-1001, because the plaintiff was not the insured. For instance, in *K.T. v. Churchill Casualty, Ltd.*, Case No. 27-1001-08-00031 (Md. Ins. Admin. Sep. 29, 2008), the MIA considered a claim brought by K.T., who claimed that she was injured when a shelf fell on her while shopping at a store named "Murry's." *Id.*, op. at 1. Murry's carried insurance for its premises through Churchill Casualty, Ltd. *Id.* K.T. claimed that Churchill had acted without good faith in denying her claim for damages arising from the accident. *Id.* The MIA held that it lacked jurisdiction, because "[o]nly first-party claims may be brought under § 27-1001 and Plaintiff admits that the insured in this case is Murry's." *Id.*, op. at 3; *see also I.M. v. Am. Skyline Ins. Co.*, Case No. 27-1001-08-00040 (Md. Ins. Admin. Oct. 31, 2008) (reaching same conclusion in analogous case). The MIA's interpretation is also reflected in its instructions for filing an administrative claim under Ins. § 27-1001, which state expressly: "A first-party claim is one made by the policy holder with the policy holder's own insurance company."[19]

---

[19] Md. Ins. Admin., "Section 27-1001 Civil Complaint Process: General Instructions for

In sum, in accordance with the plain language of the statute, as confirmed by the interpretation of the MIA, which administers the statute, I conclude that, because Whiting-Turner is the insured under the policies at issue, its claim against its own insurer is a "first-party claim" within the meaning of C.J. § 3-1701.  Therefore, Count III will not be dismissed.

I turn next to Count IV, which asserts a non-statutory, common law claim of bad faith. The Maryland Court of Appeals extensively discussed Maryland's common law with respect to insurance bad faith claims in *Mesmer v. Maryland Automobile Insurance Fund*, 353 Md. 241, 725 A.2d 1053 (1999).   In that case, the court distinguished between two situations: "(1) a liability insurer's breach of the insurance contract by erroneously disclaiming coverage, and (2) a liability insurer's undertaking to defend against a claim and its bad faith failure to settle the claim within policy limits." *Id.* at 257, 725 A.2d at 1061.

As the *Mesmer* Court explained, the first scenario does not support an independent tort cause of action; rather, "the obligation to defend and the obligation to indemnify are entirely contractual," and so "the only action against the insurer is for breach of contract." *Id.* at 258, 725 A.2d at 1061.   In contrast, a cause of action in tort is recognized under the second scenario: "The tort action can only arise when the liability insurer acknowledges coverage, or proceeds as if there were coverage, and undertakes to provide a defense to the insured" in an suit brought by a third-party claimant. *Id.* at 261-63, 725 A.2d at 1063.   However, "the insured's damages in such tort action 'are limited to the amount of any judgment in excess of policy limits' and . . . the action 'will not accrue prior to the entry of a judgment against the insured in excess of policy

---

Filing a Civil Complaint and Response With the Maryland Insurance Administration," at 1 n.1, *available at* http://www.mdinsurance.state.md.us/sa/documents/27-1001CivilComplaintProcess 06-09.pdf.

limits.'"  *Id.* at 262, 725 A.2d at 1063 (quoting *Allstate Ins. v. Campbell*, 334 Md. 381, 396-97, 639 A.2d 652, 659 (1994)).

Furthermore, Maryland case law concerning the tort indicates that an offer to settle within policy limits by the third-party claimant, or at least a reasonable opportunity to settle within policy limits, is a necessary predicate to liability.   *See, e.g.*, *Kremen v. Md. Auto. Ins. Fund*, 363 Md. 663, 682, 770 A.2d 170, 181 (2001) (affirming judgment in favor of insured against insurer for bad faith failure to settle, where "the jury was provided with evidence of [insurer's] failure to investigate fully [claimant's] closed head injury claim and of [claimant's] willingness to settle unconditionally the underlying case for [insured's] $20,000 policy limit"); *Fireman's Fund Ins. Co. v. Continental Ins. Co.*, 308 Md. 315, 317-18, 519 A.2d 202, 203 (1987) (holding that allegations of complaint supported bad faith failure-to-settle claim where insurer rejected two within-limits settlement demands); *State Farm Mut. Auto. Ins. Co. v. White*, 248 Md. 324, 326, 236 A.2d 269, 269-70 (1967) (describing question presented as involving "the duty an insurer owes to its insured when there is *an opportunity* to settle the claim within the limits of the insured's liability policy," and holding that the duty existed where insurer "refused several offers to settle within the policy limits") (emphasis added); *Sweeten v. Nat'l Mut. Ins. Co. of D.C.*, 233 Md. 52, 194 A.2d 817 (1963) (seminal Maryland case regarding good faith duty to settle; holding that insured stated cause of action against insurer where a verdict above policy limits was returned after insurer "had repeated opportunities to settle the case for a sum within the limits of the policy" but failed to do so).

The APPLEMAN treatise on insurance law is instructive in this regard.  It states:

> Even if an insurer has failed to investigate or to properly evaluate the claim against the insured and even if the insurer has adopted an improper no-

settlement approach, such misconduct does not cause any excess judgment against the insured unless the claim could have been settled had the insurer acted differently. Causation is easily shown if the claimant made a settlement demand that should have been accepted if the insurer had acted properly. Some jurisdictions hold that an insurer cannot be liable for failure to settle unless the claimant makes such a demand. . . .

Even where that is not required, imposing a duty to settle on the insurer generally requires that the insurer have had an opportunity to settle within the policy limits.

3 NEW APPLEMAN ON INSURANCE LAW, LIBRARY ED. § 23.02[6][d][i] (Oct. 2012 Supp.) ("APPLEMAN"); *see also id.* § 23.02[7] ("[I]f there is no evidence that the claim could have been settled, then any bad faith conduct would not have been the cause of the excess judgment.").[20]

Relying on *Mesmer*, Liberty Mutual contends that the bad faith tort "cannot be maintained where there has been no excess judgment rendered against an insured." Motion at 17. Because the complaint affirmatively alleges that the Nevada Suit was settled, and no judgment was entered on the merits against the insured in excess of policy limits, Liberty Mutual insists that an independent tort claim for bad faith failure to settle did not accrue. In response, Whiting-Turner relies on Liberty Mutual's alleged dilatory approach to the Nevada Suit in

---

[20] The APPLEMAN treatise discusses a split in authority over whether an insurer's good faith duty to settle is triggered only by an express, within-limits settlement demand by the third-party claimant/plaintiff, or whether an insurer may be obligated to initiate settlement negotiations on its own to seek a within-limits settlement. *See generally* 3 APPLEMAN § 23.02[6][d][iii]; *see also id.* § 23.02[8] (discussing phenomenon of "bad faith set-ups" by claimants). The treatise discusses at some length the competing incentives for the insured, the insurer, and the claimant arising from the different liability rules, and argues on policy grounds that the better rule is ordinarily that "the settlement duty is triggered only by a demand from the claimant that the insurer ought to have accepted." *Id.* § 23.02[6][d][iii]. I am unaware of a decision of a Maryland state appellate court that has chosen between the two possible rules. *But see Guttman v. Liberty Mut. Fire Ins. Co.*, Civ. No. JFM-06-2045, 2007 WL 603087, at *1 (D. Md. Feb. 22, 2007) (citing *Fireman's Fund, supra*, 308 Md. 315, 519 A.2d 202, and describing an "offer to settle within policy limits" as "a necessary predicate for a bad faith action"). However, the case law appears uniformly to require the insured to demonstrate, at a minimum, that there was some opportunity for the claim to be settled within policy limits.

support of its bad faith claim. However, Whiting-Turner does not respond directly to Liberty Mutual's assertions on the basis of *Mesmer*.

As indicated, the complaint expressly alleges that the Nevada Suit was settled. Whiting-Turner paid $850,000 toward the settlement, and Liberty Mutual paid $350,000, for a total of $1,200,000. It appears that this amount may be in excess of the per-occurrence limit of insurance under the CGL Policy, which is $1,000,000. *See* CGL Policy at A00001.[21]  I am not aware of a case expressly holding that the fact that a case was settled, rather than litigated to a verdict, necessarily precludes a bad faith claim for failure to settle, when the settlement that was reached exceeded policy limits. *Cf. Campbell*, *supra*, 334 Md. at 396-97, 639 A.2d at 659 (stating that bad faith failure-to-settle claim was not applicable "to a failure to settle initially which is followed by a settlement by the insurer and full release of the insured" *within* policy limits). Accordingly, I decline Liberty Mutual's invitation to dispose of Count IV, as a matter of law, solely on the basis that the Nevada Suit was settled, rather than litigated to judgment.

Nevertheless, Whiting-Turner has failed to plead a claim upon which relief can be granted for the tort of bad faith failure to settle. Even if Liberty Mutual was dilatory in its evaluation of settlement of the Nevada Suit, that fact alone would not expose Liberty Mutual to liability unless its alleged failure to act in good faith thwarted an opportunity to settle the suit within policy limits. Whiting-Turner's complaint contains no factual allegation that such an opportunity actually existed. Indeed, the fact that Whiting-Turner and the plaintiff in the Nevada Suit ultimately did agree to a settlement, albeit in an amount arguably above the policy limits,

---

[21] Whether the settlement actually exceeds policy limits depends on whether the Nevada Suit involved more than one "occurrence" within the meaning of the CGL Policy, which is not readily apparent from the present state of the record.

points against Liberty Mutual's liability, although it is not necessarily dispositive.  There is no basis to conclude that the amount the plaintiff in the Nevada Suit demanded in settlement was any greater because the funds came from Whiting-Turner, rather than from its insurer.  If the amount of the plaintiff's losses in the Nevada Suit exceeded Whiting-Turner's insurance policy limits, such that a within-limits settlement was not feasible, that indicates only that Whiting-Turner was underinsured, not that its insurer failed to exercise good faith.

To the extent that the claims in the Nevada Suit actually came within the coverage of the applicable policies, Whiting-Turner will be able to recover its damages, up to the policy limits, under its causes of action for breach of contract and/or statutory bad faith.  But, to the extent that there was no reasonable opportunity to settle the Nevada Suit within policy limits, a bad faith failure-to-settle claim is not viable.  Because Count IV fails to allege that such a reasonable opportunity existed, Count IV will be dismissed, without prejudice.  Plaintiff may re-plead Count IV in its amended complaint, if it can allege facts sufficient to state a claim.

Finally, I address Count V, the promissory estoppel claim.  The elements of a promissory estoppel claim in Maryland were established in the touchstone case of *Pavel Enterprises, Inc. v. A .S. Johnson Co.*, 342 Md. 143, 166, 674 A.2d 521, 533 (1996):

> 1. a clear and definite promise;
>
> 2. where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee;
>
> 3. which does induce actual and reasonable action or forbearance by the promisee; and
>
> 4. causes a detriment which can only be avoided by the enforcement of the promise.

In Maryland, promissory estoppel is, in essence, "an alternative means of obtaining contractual relief."  *Md. Transp. Auth. Police Lodge No. 34 of Fraternal Order of Police v. Md.*

*Transp. Auth.*, 195 Md. App. 124, 215, 5 A.3d 1174, 1227 (2010), *rev'd in part on other grounds*, 420 Md. 141, 21 A.3d 1098 (2011); *see also Pavel Enters.*, 342 Md. at 169, 674 A.2d at 534 ("[T]here are different ways to prove that a contractual relationship exists . . . .  Traditional bilateral contract theory is one. Detrimental reliance [a.k.a. promissory estoppel] can be another."); *Suburban Hosp., Inc. v. Sampson*, 807 F. Supp. 31, 33 (D. Md. 1992) (applying Maryland law, and stating that "the nature of a lawsuit in which promissory estoppel is invoked remains that of an action to enforce a contract").  It is "a device for contractual recovery, when an element of a traditional bilateral contract is lacking." *Md. Transp. Auth. Police Lodge*, 195 Md. App. at 218, 5 A.3d at 1229.  The detrimental reliance of the promisee serves as a substitute for the missing contractual element, such as acceptance or consideration. *See id.* at 213-15, 5 A.3d at 1226-27 (reviewing cases).

In *Ver Brycke v. Ver Brycke*, 379 Md. 669, 693, n.9, 843 A.2d 758, 772 n.9 (2004), the Maryland Court of Appeals characterized promissory estoppel as a "quasi-contract claim[ ]," and noted: "'The general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests.'" *Id.* (quoting *County Comm'rs of Caroline County v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 96, 747 A.2d 600, 607 (2000)).  Liberty Mutual seizes on this assertion and contends that Whiting-Turner's promissory estoppel claim is precluded by the existence of the insurance policies at issue.  It reasons: "The undoubted existence of the contract by which Plaintiff presently seeks a legal remedy precludes application of the doctrine of promissory estoppel." Motion at 19.

Liberty Mutual overlooks, however, that Rule 8(d)(3) of the Federal Rules of Civil Procedure permits a party to "state as many separate claims . . . as it has, regardless of consistency." Although a plaintiff "may not recover under both contract and quasi-contract theories, it is not barred from pleading these theories in the alternative . . . ." *Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc.*, 190 F. Supp. 2d 785, 792 (D. Md. 2002). Ultimately, if Whiting-Turner prevails as to breach of contract, it will not be able to proceed as to promissory estoppel. But, on the current state of the record, it appears to be hotly disputed whether Whiting-Turner in fact entered into a valid contract with Liberty Mutual. If no valid contract was formed, but Whiting-Turner is able to marshal evidence to satisfy the elements of promissory estoppel, its claim of promissory estoppel may succeed. Accordingly, Count V is not subject to dismissal for failure to state a claim.

### Conclusion

For the foregoing reasons, I will grant Liberty Mutual's Motion in part and deny it in part. In particular, I will dismiss Count IV, and all of the counts will be dismissed as to Liberty Mutual to the extent that they are premised on the CGL Policy. Whiting-Turner will be granted leave to amend. In all other respects, the Motion will be denied. An Order implementing my rulings follows.

Date:   December 13, 2012                    _____/s/_____
                                             Ellen Lipton Hollander
                                             United States District Judge